OPINION
O’SCANNLAIN, Circuit Judge:
We are called upon to decide whether a responsible, law-abiding citizen has a right under the Second Amendment to carry a firearm in public for self-defense.
I
A
California generally prohibits the open or concealed carriage of a handgun, whether loaded or unloaded, in public locations.[1] See CaLPenal Code § 25400 (prohibiting concealed carry of a firearm); id. § 25850 (prohibiting carry of a loaded firearm); id. § 26350 (prohibiting open carry of an unloaded firearm); see also id. § 25605 (exempting the gun owner’s residence, other private property, and place of business from section 25400 and section 26350).
*1148 Nonetheless, one may apply for a license in California to carry a concealed weapon in the city or county in which he or she works or resides. Id. §§ 26150, 26155. To obtain such a license, the applicant must meet several requirements. For example, one must demonstrate “good moral character,” complete a specified training course, and establish “good cause.” Id. §§ 26150, 26155.
California law delegates to each city and county the power to issue a written policy setting forth the procedures for obtaining a concealed-carry license. Id. § 26160. San Diego County has issued such a policy. At issue in this appeal is that policy’s interpretation of the “good cause” requirement found in sections 26150 and 26155: “[A] set of circumstances that distinguish the applicant from the mainstream and causes him or her to be placed in harm’s way.” Good cause is “evaluated on an individual basis” and may arise in “situations related to personal protection as well as those related to individual businesses or occupations.” But — important here — concern for “one’s personal safety alone is not considered good cause.”
The power to grant concealed-carry licenses in San Diego County is vested in the county sheriffs department. Since 1999, the sheriffs department has required all applicants to “provide supporting documentation” in order “to demonstrate and elaborate good cause.” This “required documentation, such as restraining orders, letters from law enforcement agencies or the [district attorney] familiar with the case, is discussed with each applicant” to determine whether he or she can show a sufficiently pressing need for self-protection. If the applicant cannot demonstrate “circumstances that distinguish [him] from the mainstream,” then he will not qualify for a concealed-carry permit.
B
Wishing to carry handguns for self-defense but unable to document specific threats against them, plaintiffs Edward Peruta, Michelle Laxson, James Dodd, Leslie Buncher, and Mark Cleary (collectively “the applicants”), all residents of San Diego County, were either denied concealed-carry licenses because they could not establish “good cause” or decided not to apply, confident that their mere desire to carry for self-defense would fall short of establishing “good cause” as the County defines it. An additional plaintiff, the California Rifle and Pistol Association Foundation, comprises many San Diego Country residents “in the same predicament as the individual Plaintiffs.” No plaintiff is otherwise barred under federal or state law from possessing firearms.
C
On October 23, 2009, after the County denied his application for a concealed-carry license, Peruta sued the County of San Diego and its sheriff, William Gore (collectively “the County”), under 42 U.S.C. § 1983, requesting injunctive and declaratory relief from the enforcement of the County policy’s interpretation of “good cause.” Peruta’s lead argument was that, by denying him the ability to carry a loaded handgun for self-defense, the County infringed his right to bear arms under the Second Amendment.
About a year later, the applicants and the County filed dueling motions for summary judgment. The district court denied the applicants’ motion and granted the County’s. Assuming without deciding that the Second Amendment “encompasses Plaintiffs’ asserted right to carry a loaded handgun in public,” the district court upheld the County policy under intermediate scrutiny. As the court reasoned, California’s “important and substantial interest in *1149 public safety” — particularly in “reducing] the risks to other members of the public” posed by concealed handguns’ “disproportionate involvement in life-threatening crimes of violence” — trumped the applicants’ allegedly burdened Second Amendment interest. The district court rejected all of the other claims, and the applicants timely appealed.
II
As in the district court, on appeal the applicants place one argument at center stage: they assert that by defining “good cause” in San Diego County’s permitting scheme to exclude a general desire to carry for self-defense, the County impermissi-bly burdens their Second Amendment right to bear arms.
The Supreme Court’s opinions in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), direct our analysis of this claim. In Heller, the Court confronted a Second Amendment challenge to a District of Columbia law that “totally ban[ned] handgun possession in the home” and “require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock.” 554 U.S. at 603, 628-29, 128 S.Ct. 2783. The validity of the measures depended, in the first place, on whether the Second Amendment codified an individual right, as plaintiff Dick Heller maintained, or a collective right, as the government insisted. Id. at 577, 128 S.Ct. 2783.
Consulting the text’s original public meaning, the Court sided with Heller, concluding that the Second Amendment codified a pre-existing, individual right to keep and bear arms and that the “central component of the right” is self-defense. Id. at 592, 599, 128 S.Ct. 2783. It further held that, because “the need for defense of self, family, and property is most acute in the home,” the D.C. ban on the home use of handguns — “the most preferred firearm in the nation” — failed “constitutional muster” under any standard of heightened scrutiny. Id. at 628-29 & n. 27, 128 S.Ct. 2783 (rejecting rational-basis review). The same went for the trigger-lock requirement. Id. at 635, 128 S.Ct. 2783. The Court had no need to “undertake an exhaustive historical analysis ... of the full scope of the Second Amendment” to dispose of Heller’s suit. Id. at 626-27, 128 S.Ct. 2783. Nor had it reason to specify, for future cases, which burdens on the Second Amendment right triggered which standards of review, or whether a tiered-scrutiny approach was even appropriate in the first place. Id. at 628-29, 128 S.Ct. 2783. By any measure, the District of Columbia law had overreached.
Two years later, the Court evaluated a similar handgun ban enacted by the City of Chicago. The question presented in McDonald, however, was not whether the ban infringed the city residents’ Second Amendment rights, but whether a state government could even be subject to the strictures of the Second Amendment. That depended on whether the right could be said to be “deeply rooted in this Nation’s history and tradition” and “fundamental to our scheme of ordered liberty.” 130 S.Ct. at 3036. To these questions, the McDonald Court declared, “[o]ur decision in Heller points unmistakably to the answer.” Id. After all, self-defense, recognized since ancient times as a “basic right,” is the “central component” of the Second Amendment guarantee. Id. Consequently, that right restricted not only the federal government but, under the Fourteenth Amendment, also the states. Id. at 3026. Having so concluded, the Court remanded the case to the Seventh Circuit for an analysis of whether, in light *1150 of Heller, the Chicago handgun ban infringed the Second Amendment right. Id. at 3050.
It doesn’t take a lawyer to see that straightforward application of the rule in Heller will not dispose of this case. It should be equally obvious that neither Heller nor McDonald speaks explicitly or precisely to the scope of the Second Amendment right outside the home or to what it takes to “infringe” it. Yet, it is just as apparent that neither opinion is silent on these matters, for, at the very least, “the Supreme Court’s approach ... points in a general direction.” Ezell v. City of Chicago, 651 F.3d 684, 700 (7th Cir.2011) (noting that Heller does not leave us “without a framework for how to proceed”). To resolve the challenge to the D.C. restrictions, the Heller majority described and applied a certain methodology: it addressed, first, whether having operable handguns in the home amounted to “keep[ing] and bearing] Arms” within the meaning of the Second Amendment and, next, whether the challenged laws, if they indeed did burden constitutionally protected conduct, “infringed” the right. We apply that' approach here, as we have done in the past, United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir.2013), and as many of our sister circuits have done in similar cases. See, e.g., Nat’l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 194 (5th Cir.2012) (“A two-step inquiry has emerged as the prevailing approach.”); United States v. Greeno, 679 F.3d 510, 518 (6th Cir.2012); Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1252 (D.C.Cir.2011); Ezell, 651 F.3d at 701-04; United States v. Chester, 628 F.3d 673, 680 (4th Cir.2010); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir.2010); United States v. Marzza-rella, 614 F.3d 85, 89 (3d Cir.2010).
A
The first question goes to the scope of the guarantee: Does the restricted activity — here, a restriction on a responsible, law-abiding citizen’s[2] ability to carry a gun outside the home for self-defense — fall within the Second Amendment right to keep and bear arms for the purpose of self-defense? Ezell, 651 F.3d at 701; see also Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 96 (2d Cir.2012). Concerning the precise methods by which that right’s scope is discerned, the Heller and McDonald Courts were hardly shy: we must consult “both text and history.” Heller, 554 U.S. at 595, 128 S.Ct. 2783; see also McDonald, 130 S.Ct. at 3047 (reiterating that “the scope of the Second Amendment right” is determined by historical analysis and not interest balancing).
The analysis begins — as any interpretive endeavor must — with the text. “Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.” Heller, 554 U.S. at 634-35, 128 S.Ct. 2783. To *1151 arrive at the original understanding of the right, “we are guided by the principle that ‘[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning,’” unless evidence suggests that the language was used idiomatically. Id. at 576, 128 S.Ct. 2783 (quoting United States v. Sprague, 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931)).
Since the goal is to arrive at a fair, not a hyper-literal, reading of the Constitution’s language, Heller’s analysis is necessarily a contextual — and therefore a historical — one. See Chester, 628 F.3d at 680 (“This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right....”). It begins with the pre-ratifi-cation “historical background of the Second Amendment,” since “the Second Amendment ... codified a preexisting right.” Heller, 554 U.S. at 592, 128 S.Ct. 2783 (emphasis omitted). Next, it turns to whatever sources shed light on the “public understanding [of the Second Amendment] in the period after its enactment or ratification,” see id. at 605-10, 128 S.Ct. 2783, such as nineteenth-century judicial interpretations and legal commentary. See id. at 605, 128 S.Ct. 2783 (“We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century.”); id. at 610-19, 128 S.Ct. 2783 (surveying “Pre — Civil War Case Law,” “Post — Civil War Legislation,” and “Post — Civil War Commentators”).
Of course, the necessity of this historical analysis presupposes what Heller makes explicit: the Second Amendment right is “not unlimited.” Id. at 595, 128 S.Ct. 2783. It is “not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” Id. at 626, 128 S.Ct. 2783. Rather, it is a right subject to “traditional restrictions,” which themselves — and this is a critical point — tend “to show the scope of the right.” McDonald, 130 S.Ct. at 3056 (Scalia, J., concurring); see also Kachal-sky, 701 F.3d at 96; Nat’l Rifle Ass’n of Am., 700 F.3d at 196 (“For now, we state that a longstanding presumptively lawful regulatory measure ... would likely [burden conduct] outside the ambit of the Second Amendment.”); United States v. Skoien, 614 F.3d 638, 640 (7th Cir.2010) (en banc) (“That some categorical limits are proper is part of the original meaning”).
In short, the meaning of the Second Amendment is a matter not merely of abstract dictionary definitions but also of historical practice. As “[n]othing but conventions and contexts cause [language] to convey a particular idea,” we begin our analysis of the scope of the Second Amendment right by examining the text of the amendment in its historical context. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts xxvii (2012).
1
The Second Amendment secures the right not only to “keep” arms but also to “bear ” them — the verb whose original meaning is key in this case. Saving us the trouble of pulling the eighteenth-century dictionaries ourselves, the Court already has supplied the word’s plain meaning: “At the time of the founding, as now, to ‘bear’ meant to ‘carry.’ ” Heller, 554 U.S. at 584, 128 S.Ct. 2783.[3] Yet, not “carry” in *1152 the ordinary sense of “conveying] or transporting]” an object, as one might carry groceries to the check-out counter or garments to the laundromat, but “carry for a particular purpose — confrontation.” Id. The “natural meaning of ‘bear arms,’ ” according to the Heller majority, was best articulated by Justice Ginsburg in her dissenting opinion in Muscarello v. United States, 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998): to “ ‘wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a ease of conflict with another person.’ ” Heller, 554 U.S. at 584, 128 S.Ct. 2783 (quoting Muscarello, 524 U.S. at 143, 118 S.Ct. 1911) (Ginsburg, J., dissenting) (quoting Black’s Law Dictionary 214 (6th ed.1998)); see also id. at 592, 128 S.Ct. 2783 (concluding that the Second Amendment “guarantee[s] the individual right to ... carry weapons in case of confrontation”).
Speakers of the English language will all agree: “bearing a weapon inside the home” does not exhaust this definition of “carry.” For one thing, the very risk occasioning such carriage, “confrontation,” is “not limited to the home.” Moore v. Ma-digan, 702 F.3d 933, 936 (7th Cir.2012). One needn’t point to statistics to recognize that the prospect of conflict — at least, the sort of conflict for which one would wish to be “armed and ready” — is just as menacing (and likely more so) beyond the front porch as it is in the living room. For that reason, “[t]o speak of ‘bearing’ arms within one’s home would at all times have been an awkward usage.” Id. To be sure, the idea of carrying a gun “in the clothing or in a pocket, for the purpose ... of being armed and ready,” does not exactly conjure up images of father stuffing a six-shooter in his pajama’s pocket before heading downstairs to start the morning’s coffee, or mother concealing a handgun in her coat before stepping outside to retrieve the mail. Instead, it brings to mind scenes such as a woman toting a small handgun in her purse as she walks through a dangerous neighborhood, or a night-shift worker carrying a handgun in his coat as he travels to and from his job site.
More importantly, at the time of the Second Amendment’s enactment, the familiar image that “bear arms” would have painted is one of an eighteenth-century frontiersman, who “from time to time [would] leave [his] home to obtain supplies from the nearest trading post, and en route one would be as much (probably more) at risk if unarmed as one would be in one’s home unarmed.” Id. at 936. Indeed, it was this spirit of the arms-bearing settler that Senator Charles Sumner invoked (and the Heller Court cited as instructive of the scope of the right) in the (in)famous “Crime against Kansas” speech in 1856: “The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defence, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached.” 4 The Works of Charles Sumner 211-12 (1875); see also Heller, 554 U.S. at 609, 128 S.Ct. 2783.
Other passages in Heller and McDonald suggest that the Court shares Sumner’s view of the scope of the right. The Second *1153 Amendment, Heller tells us, secures “the right to ‘protect[] [oneself] against both public and private violence,’ thus extending the right in some form to wherever a person could become exposed to public or private violence.” United States v. Mas-ciandaro, 638 F.3d 458, 467 (4th Cir.2011) (Niemeyer, J., specially concurring) (quoting Heller, 554 U.S. at 594, 128 S.Ct. 2783 (emphasis added)). The Court reinforced this view by clarifying that the need for the right is “most acute” in the home, Heller, 554 U.S. at 628, 128 S.Ct. 2783, thus implying that the right exists outside the home, though the need is not always as “acute.” See also McDonald, 130 S.Ct. at 3044 (2010) (“[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.”). In a similar vein, Heller identifies “laws forbidding the carrying of firearms in sensitive places such as school and government buildings” as presumptively lawful. 554 U.S. at 626, 128 S.Ct. 2783. Were the right restricted to the home, the constitutional invincibility of such restrictions would go without saying. Finally, both Heller and McDonald identify the “core component” of the right as self-defense, which necessarily “take[s] place wherever [a] person happens to be,” whether in a back alley or on the back deck. Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L.Rev. 1443, 1515 (2009); see also Moore, 702 F.3d at 937 (“To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in Heller and McDonald”).
These passages alone, though short of dispositive, strongly suggest that the Second Amendment secures a right to carry a firearm in some fashion outside the home. Reading those lines in light of the plain-meaning definition of “bear Arms” elucidated above makes matters even clearer: the Second Amendment right “could not rationally have been limited to the home.” Moore, 702 F.3d at 936. Though people may “keep Arms” (or, per Heller's definition, “have weapons,” 554 U.S. at 582, 128 S.Ct. 2783) in the home for defense of self, family, and property, they are more sensibly said to “bear Arms” (or, Heller's gloss: “carry [weapons] ... upon the person or in the clothing or in a pocket,” id. at 584, 128 S.Ct. 2783) in nondomestic settings.[4] Kachalsky, 701 F.3d at 89 n. 10 (“The plain text of the Second Amendment does not limit the right to bear arms to the home.”); see also Drake v. Filko, 724 F.3d 426, 444 (3d Cir.2013) (Hardiman, J., dissenting) (“To speak of ‘bearing’ arms solely within one’s home not only would conflate ‘bearing’ with ‘keeping,’ in derogation of the Court’s holding that the verbs codified distinct rights, but also would be awkward usage given the meaning assigned the terms by the Supreme Court.”).
2
In addition to a textual analysis of the phrase “bear Arms,” we, like the Court in Heller, look to the original public understanding of- the Second Amendment right as evidence of its scope and meaning, relying on the “important founding-era legal *1154 scholars.” See Heller, 554 U.S. at 600-03, 605-10, 128 S.Ct. 2783 (examining the public understanding of the Second Amendment in the period after its ratification because “[t]hat sort of inquiry is a critical tool of constitutional interpretation”).
The commonsense reading of “bear Arms” previously discussed finds support in several important constitutional treatises in circulation at the time of the Second Amendment’s ratification. See id. at 582-83, 592-93, 128 S.Ct. 2783 (treating such sources as instructive of the clause’s original meaning). Writing on the English right to arms, William Blackstone noted in his Commentaries on the Laws of England that the “the right of having and using arms for self-preservation and defence” had its roots in “the natural right of resistance and self-preservation.” Heller, 554 U.S. at 594, 128 S.Ct. 2783 (internal citations and quotations omitted). It was this inherited right of armed self-defense, according to Heller, that “by the time of the founding [was] understood to be an individual right protecting against both public and private violence.” Id. (emphasis added). Although Blackstone elsewhere described a fourteenth-century English statute that forbad the “riding or going armed with dangerous or unusual weapons,” that prohibition was understood to cover carriage of uncommon, frightening weapons only. Indeed, Justice James Wilson, an early American legal commentator and framer, confirmed this narrower reading, see 2 James Wilson, The Works of James Wilson 654 (Robert McCloskey ed.1967), citing an English commentator for the proposition that wearing ordinary weapons in ordinary circumstances posed no problem. See Eugene Volokh, The First and Second Amendments, 109 Colum. L.Rev. Sidebar 97, 101 (2009) (“American bench-books for justices of the peace echoed [Wilson’s observation].”); Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 105 (1994) (quoting an English case recognizing “a general Connivance to Gentlemen to ride armed for their security,” notwithstanding the statute); see also William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829) (observing that the Second Amendment would not forbid the prohibition of the “carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them”). It is likely for this reason that Heller cites Blackstone’s commentary on the statute as evidence not of the scope of the “keep and bear” language but of what weapons qualify as a Second Amendment “arms.” See Heller, 554 U.S. at 627, 128 S.Ct. 2783.
Writing over thirty years later in what Heller calls the “most important” American edition of Blackstone’s Commentaries, id. at 594, 128 S.Ct. 2783, St. George Tucker, a law professor and former Antifederalist, affirmed Blackstone’s comments on the British right and commented further on its American dimensions. The right to armed self-defense, Tucker insisted, is the “first law of nature,” and any law “prohibiting any person from bearing arms” crossed the constitutional line. St. George Tucker, Blackstone’s Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States; and of the Commonwealth of Virginia 289 (1803). Tucker went on to note that, though English law presumed that any gathering of armed men indicated that treasonous plotting was afoot, it would have made little sense to apply such an assumption in the colonies, “where the right to bear arms is recognized and secured in the constitution itself.” Tucker, supra, vol. 5, app., n.B, at 19. After all, “[i]n many parts of the United States, a man no more thinks, of going out of his *1155 house on any occasion, without his rifle or musket in his hand, than a European fíne gentleman without his sword by his side.” Id.; see also Michael P. O’Shea, Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of “Bearing Arms” for Self-Defense, 61 Am. U.L.Rev. 585, 637-38 (2012). Likewise, Edward Christian — another Blackstone commentator from that period— maintained that this inherited right allowed “everyone ... to keep or carry a gun, if he does not use it for the [unlawful] destruction of game.” See Clayton E. Cramer & Joseph Edward Olson, What Did “Bear Arms” Mean in the Second Amendment?, 6 Geo. J.L. & Pub. Pol’y 511, 517 (2008) (quoting 2 William Blackstone, Commentaries 441 (Edward Christian ed., 1795)).
3
In keeping with the views of the important late-eighteenth-eentury commentaries, the great weight of nineteenth-century precedent on the Second Amendment or its state-law analogues confirms the Heller-endorsed understanding of “bear Arms.”[5] In fact, as we will show, many of the same cases that the Heller majority invoked as proof that the Second Amendment secures an individual right may just as easily be cited for the proposition that the right to carry in case of confrontation means nothing if not the general right to carry a common weapon outside the home for self-defense.
a
But before turning to the cases themselves, we offer a word on methodology. We set out to review the bulk of precedents from this period.[6] All are, in a broad sense, equally relevant, for every historical gloss on the phrase “bear arms” furnishes a clue of that phrase’s original or customary meaning. Still, some cases are more equal than others.[7] That’s because, with Heller on the books, the Second Amendment’s original meaning is now settled in at least two relevant respects. First, Heller clarifies that the keeping and bearing of arms is, and has always been, an individual right. See, e.g., 554 U.S. at 616, 128 S.Ct. 2783. Second, the right is, and has always been, oriented to the end of self-defense. See, e.g., id. Any contrary interpretation of the right, whether propounded in 1791 or just last week, is error. What that means for our review is that historical interpretations of the right’s scope are of varying probative worth, falling generally into one of three categories *1156 ranked here in descending order: (1) authorities that understand bearing arms for self-defense to be an individual right, (2) authorities that understand bearing arms for a purpose other than self-defense to be an individual right, and (3) authorities that understand bearing arms not to be an individual right at all.
To illustrate, a precedent in the first category that declared a general right to carry guns in public would be a great case for Peruta, while a decision in the same group that confined exercise of the right to the home would do his position much damage. By contrast, those cases in the third category — which, like the dissenting opinions in Heller, espouse the view that one has a right to bear arms only collectively in connection with militia service and not for self-defense within or outside the home — are of no help. The second category, consisting mostly of cases that embrace the premise that the right’s purpose is deterring tyranny, is only marginally useful. Since one needn’t exactly tote a pistol on his way to the grocery store in order to keep his government in check, it is no surprise (and, thus, of limited significance for purposes of our analysis) when these courts suggest that the right is mostly confined to the home. Likewise, a second-category case asserting that the goal of tyranny prevention does indeed call for public weapon bearing lends only indirect support for the proposition that bearing arms in case of confrontation includes carrying weapons in public for self-defense.
b
Having set forth the methodology to be employed, we turn to the nineteenth-century case law interpreting the Second Amendment, beginning with the cases that the Court itself relied upon in Heller.
The first case is Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822), cited in Heller, 554 U.S. at 585 n. 9, 128, S.Ct. 2783, a decision “especially significant both because it is nearest in time to the founding era and because the state court assumed (just as [Heller ] does) that the constitutional provision ... codified a preexisting right.” Nelson Lund, The Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA L.Rev. 1343, 1360 (2009). There, Kentucky’s highest court interpreted that state’s Second Amendment analogue (“the right of the citizens to bear arms in defense of themselves and the state, shall not be questioned”) as invalidating a ban on “wearing concealed arms.” Bliss, 12 Ky. (2 Litt.) at 90. The Commonwealth’s lead argument to the contrary had been that, though Kentucky’s constitution forbad prohibitions on the exercise of the right, it permitted laws “merely regulating the manner of exercising that right.” Id. at 91. Although the court agreed with the Commonwealth’s argument in principle, it disagreed with the conclusion that the ban on “wearing concealed arms” was merely a means of “regulating the manner of exercising” the right. Id. An act needn’t amount to a “complete destruction” of the right to be “forbidden by the explicit language of the constitution,” since any statute that “diminish[ed] or impair[ed the right] as it existed when the constitution was formed” would also be “void.” Id. at 92. Thus, had the statute purported to prohibit both the concealed and open carriage of weapons, effecting an “entire destruction of the right,” it would have been an obvious nullity; but even as a ban on concealed carry alone there could be “entertained [no] reasonable doubt but [that] the provisions of the act import a restraint on the right of the citizens to bear arms.” Id. at 91-92 (emphasis added). Striking down the law, the court explained that the preexisting right to bear arms had “no limits short of the moral power of the citizens to exercise it, and it in fact consist *1157 ed in nothing else but in the liberty of the citizens to bear arms. Diminish that liberty, therefore, and you necessarily restrain the right.” Id. at 92.
In Simpson v. State, the Tennessee Supreme Court read that state’s Second Amendment analogue just as the Bliss court read Kentucky’s. 13 Tenn. (5 Yer.) 356 (1833), cited in Heller, 554 U.S. at 585 n. 9, 128 S.Ct. 2783. Convicted of the crime of affray for appearing in public “arrayed in a warlike manner” (i.e., armed), Simpson argued that the state should have had to prove that he had committed acts of physical violence to convict him. Id. at 361-62. The court agreed, concluding in part that even if the common law did not require proof of actual violence to punish persons for merely walking around with weapons, the state constitution’s protection of the “right to keep and to bear arms” would trump: “[I]t would be going much too far, to impair by construction or abridgment a constitutional privilege which is so declared.” Id. at 360; cf. State v. Huntly, 25 N.C. (3 Ired.) 418 (1843) (rejecting a “right to bear arms” defense and upholding an affray conviction of a defendant who, threatening to kill off a certain family, was caught carrying an unusual weapon in public). It went without saying, evidently — for the court offered little in the way of analysis — that whatever else the constitution meant by “bear arms,” it certainly implied the right to carry operable weapons in public. The court confirmed as much in 1871, holding that an act that proscribed openly carrying a pistol “publicly or privately, without regard to time or place, or circumstances” went too far, even though the statute exempted from its prohibitions the carrying of long guns. Andrews v. State, 50 Tenn. 165, 187 (1871), cited in Heller, 554 U.S. at 608, 629, 128 S.Ct. 2783.
Though the Tennessee Supreme Court announced a slightly different view of the right to bear arms in Aymette v. State, that case is plainly consistent with — and indeed affirms — the principle that the right to bear arms extends out of doors. 21 Tenn. 154 (1840), cited in Heller, 554 U.S. at 613-14, 128 S.Ct. 2783. Commenting on the “manifest distinction” between a restriction on “wearing concealed weapons” (which the court upheld) and a prohibition on open carry, the court observed with little fanfare that “[i]n the nature of things, if [persons] were not allowed to bear arms openly, they could not bear them in their defense of the State at all.” Id. at 160. The court marshaled this point in support of the second-category position “whereby citizens were permitted to carry arms openly, unconnected with any service in a formal militia, but were given the right to use them only for the military purpose of banding together to oppose tyranny” — a view of the right’s end that Heller explicitly rejects. Heller, 554 U.S. at 613, 128 S.Ct. 2783 (“[Aymette’s ] odd reading of the right is, to be sure, not the one we adopt.”). Nonetheless, what remains of Aymette is its observation that the right to bear arms, even if not in the service of personal self-defense, must include the right to carry guns outside the home.
The Alabama Supreme Court weighed in that same year. See State v. Reid, 1 Ala. 612 (1840), cited in Heller, 554 U.S. at 629, 128 S.Ct. 2783. Taking a view of the right narrower than that of the Simpson court, it nonetheless declared that the constitutional guarantee of “a right to bear arms, in defense of [ ]self and the State,” meant that an Alabamian must be permitted to carry a weapon in public in some fashion. Id. at 615, 128 S.Ct. 2783. Reid, found guilty of the “evil practice of carrying weapons secretly,” challenged the constitutionality of the statute of conviction. Id. at *1158 614, 128 S.Ct. 2783. Rejecting this challenge, the court held that the state constitution’s enumeration of the right did not strip the legislature of the power “to enact laws in regard to the manner in which arms shall be borne ... as may be dictated by the safety of the people and the advancement of public morals.” Id. at 616, 128 S.Ct. 2783. And, departing to some degree from the approach in Bliss, the court concluded that Alabama’s concealed-carry law was just such a regulation, going no further than forbidding that means of arms bearing thought “to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others.” Id. at 617, 128 S.Ct. 2783. The act’s narrowness ensured its validity:
We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.
Id. at 616-17, 128 S.Ct. 2783. Read in light of the court’s earlier statement that a restriction on arms bearing would stand so long as it simply proscribed the “manner in which arms shall be borne,” this passage suggests that to forbid nearly all forms of public arms bearing would be to destroy the right to bear arms entirely.[8]
Embracing precisely that position, the Georgia Supreme Court’s decision in Nunn v. State six years later — praised in Heller as “perfectly captur[ing]” the relationship between the Second Amendment’s two clauses, 554 U.S. at 612, 128 S.Ct. 2783 — made explicit what Reid, intimated. 1 Ga. 243 (1846), cited in Heller, 554 U.S. at 612, 626, 629, 128 S.Ct. 2783. Convicted of keeping a pistol on his person — a statutory misdemeanor (whether the pistol was carried openly or “secretly”) — Nunn attacked the statute of conviction as an unconstitutional infringement of his right to bear arms under the Second Amendment. Id. at 246. The court began with a statement of the constitutional standard: “The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree.” Id. at 251. Turning to the statute, the court reasoned that had it merely limited the manner of the exercise of the right to carry, it would have withstood scrutiny. As written, however, it went too far:
We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void; and that, as the defendant has been indicted and convicted for carrying a pistol, without charging that it was *1159 done in a concealed manner, under that portion of the statute which entirely forbids its use, the judgment of the court below must be reversed, and the proceeding quashed.
Id. In other words, as the same court explained in a later case involving a defendant charged with illicit open carriage, to ban both the open and concealed carriage of pistols “would be to prohibit the bearing of those arms” altogether. Stockdale v. State, 32 Ga. 225, 227 (1861) (adding that such a set of restrictions “would ... bring the Act within the decision in Nunn’s case”).
Although the Arkansas Supreme Court in State v. Buzzard appeared at first to take the contrary position, viewing restrictions on carrying weapons for self-defense as permissible police-power regulations, see 4 Ark. 18 (1842); see also Fife v. State, 31 Ark. 455 (1876) (relying on Buzzard to uphold a prohibition on concealed carry); Carroll v. State, 28 Ark. 99 (1872) (same), the court staked its position on two interpretations of the Second Amendment right that the Heller Court repudiated — and from which the Arkansas court itself later retreated. According to one judge in the splintered majority, the Second Amendment secured a right to bear arms for use in militia service but not a right to bear arms for personal self-defense. Id. at 22 (opinion of Ringo, C.J.). Writing separately, the other judge in the majority went further, asserting that the Second Amendment secured no individual right. Id. at 32 (opinion of Dickinson, J.); compare id. at 43 (Lacy, J., dissenting) (arguing that the court should have embraced the Bliss view). Neither interpretation survives Heller — which is also to say that neither opinion elucidates the right’s originally understood scope.[9] Yet it didn’t take Heller to convince the Arkansas Supreme Court that Buzzard could use some shearing. Writing in 1878, the court clarified that while “the Legislature might, in the exercise of the police power of the State, regulate the mode of wearing arms,” banning “the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey ... or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.” Wilson v. State, 33 Ark. 557, 560 (1878).
State v. Chandler, an 1850 decision of the Louisiana Supreme Court, proceeds along the lines drawn in Nunn. 5 La.Ann. 489 (1850), cited in Heller, 554 U.S. at 613, 626, 128 S.Ct. 2783. Rejecting the argument that Louisiana’s ban on carrying concealed weapons infringed the Second Amendment right, the court explained that the prohibition was “absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons.” Id. at 489-90. A ban on the open carriage of weapons, by contrast, would enjoy no such justification. Echoing Reid, the court said;
[The Act] interfered with no man’s right to carry arms (to use its words) “in full open view,” which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, *1160 without any tendency to secret advantages and unmanly assassinations.
Id. at 490; see also Heller; 554 U.S. at 613, 128 S.Ct. 2783 (citing favorably Chandler’s holding that “citizens had a right to carry arms openly”); State v. Jumel, 13 La.Ann. 399, 400 (1858) (invoking Chandler for the proposition that “prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society” does not infringe the right).
Nine years later, the Texas Supreme Court declared that “[t]he right of a citizen to bear arms, in the lawful defense of himself or the state, is absolute,” permitting even the wielding of a Bowie knife, “the most deadly of all weapons in common use.” Cockrum v. State, 24 Tex. 394, 403 (1859). Though the state legislature was free to discourage the carriage of such an “exceedingly] destructive weapon,” it could not adopt measures effectively prohibiting its use as a defensive arm: “[A]d-monitory regulation of the abuse [of the right] must not be carried too far. It certainly has a limit. For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right.” Id.[10]
Thus, the majority of nineteenth century courts agreed that the Second Amendment right extended outside the home and included, at minimum, the right to carry an operable weapon in public for the purpose of lawful self-defense. Although some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public.
Indeed, we know of only four cases from that period rejecting the presumptive-carry view. Three of the four, however, are not category-one cases. See Haile v. State, 38 Ark. 564 (1882) (espousing a militia-based reading of the right); Hill v. State, 53 Ga. 472 (1874) (same); English v. State, 35 Tex. 473 (1872) (same). Consequently, they shed no light on the question whether, if the right to bear arms is an individual right directed to the end of self-defense, it sanctions the public carriage of common weapons. In the fourth case, State v. Duke, the court does begin with the Heller-endorsed understanding of the right but nonetheless concludes that, while the right contemplates weapon carrying in certain places outside the home (e.g., one’s business) and in circumstances reasonably giving rise to fear of attack, the right is otherwise subject to heavy-handed regulation. 42 Tex. 455, 459 (1875). Yet, Duke is distinguishable: it construed the guarantee of the right to bear arms as it appeared in the Texas Constitution of 1869, which permitted “such regulations [of the right] as the legislature may prescribe.” Id. at 458. The Second Amendment’s text contains no such open-ended clause restricting its application, and we ought not to go looking for an unwritten one.
4
As the Court did in Heller, we turn next to the post — Civil War legislative scene. *1161 Although consulting post — Civil War discussions may seem to be an unusual means for discerning the original public meaning of the right — particularly given that these discussions postdate the Second Amendment’s ratification by three-quarters of a century — we hew to the Supreme Court’s conclusion that they retain some significance, albeit less than earlier interpretations of the right. See Heller, 554 U.S. at 614-18, 128 S.Ct. 2783; see also McDonald, 130 S.Ct. at 3038-42. After the Civil War, “there was an outpouring of discussion of Second Amendment in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly freed slaves.” Heller, 554 U.S. at 614, 128 S.Ct. 2783. As this discussion was led by “those born and educated in the early 19th century” near the time of the Second Amendment’s enactment, “their understanding of the origins and continuing significance of the Amendment is instructive.” Id.
Perhaps unsurprisingly, our review suggests that their understanding comports with that of most nineteenth-century courts: then, as at the time of the founding, “[t]he right of the people ... to bear arms meant to carry arms on one’s person.” Stephen P. Halbrook, Securing Civil Rights, Freedmen, the Fourteenth Amendment, and the Right to Bear Arms 50 (1998).
Our examination of the Civil War legislative scene begins with the Supreme Court’s infamous decision in Dred Scott v. Sanford, 60 U.S. 393, 19 How. 393, 15 L.Ed. 691 (1856). According to the Supreme Court in Dred Scott, black slaves and their descendants “had no rights which the white man was bound to respect” — pouring fuel on the flames of the nation’s already-blazing sectional crisis just four years before the firing on Fort Sumter. Id. at 407. At the heart of this holding was the Court’s conclusion that at no point had blacks ever been members of the sovereign “people” of the United States. It apparently followed from this premise that, as constitutional non-citizens, blacks lacked not only the right to “full liberty of speech in public and private” and “to hold meetings upon political affairs” but also the constitutional right “to keep and carry arms wherever they went.”. Id. at 417 (emphasis added). It was in large part in reaction to Dred Scott’s logic, on which the Black Codes of the post-war South plainly rested, that the Reconstruction Congress sprung into action. Heller, 554 U.S. at 614, 128 S.Ct. 2783. It was, of course, no coincidence that the codes, designed to deny the privileges of constitutional citizenship to the freedmen, took aim at that most fundamental right of keeping and bearing arms. Clayton E. Cramer, The Racist Roots of Gun Control, 4 Kan. J.L. & Pub. Pol’y 17, 20 (Winter 1995) (“The various Black Codes adopted after the Civil War required blacks to obtain a license before carrying or possessing firearms or bowie knives.... These restrictive gun laws played a part in provoking Republican efforts to get the Fourteenth Amendment passed.”); see also Stephen P. Halbrook, Personal Security, Personal Liberty, and “The Constitutional Right to Bear Arms”: Visions of the Framers of the Fourteenth Amendment, 5 Seton Hall Const. L.J. 341, 348 (1995) (“One did not have to look hard to discover state ‘statutes relating to the carrying of arms by negroes’ and to an ‘act to prevent free people of color from carrying firearms.’ ” (citations omitted)). As Heller notes, “[t]hose who opposed these injustices frequently stated that they infringed blacks’ constitutional right to keep and bear arms.” Heller, 554 U.S. at 614, 128 S.Ct. 2783.
By all accounts, the model of such codes was Mississippi’s 1865 “Act to Regulate *1162 the Relation of Master and Apprentice Relative to Freedman, Free Negroes, and Mulattoes,” which provided in part that “no freedman, free negro or mulatto ... shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife” and that “any freedman, free negro or mulatto found with any such arms or ammunition” was subject to arrest. 1866 Miss. Laws ch. 23, § 1, 165 (1865). The act, rigorously enforced, led to a thorough confiscation of blackowned guns, whether found at home or bn the person: “The militia of this country have seized every gun and pistol found in the hands of the (so called) freedmen. ... They claim that the statute laws of Mississippi do not recognize the negro as having any right to carry arms. They commenced seizing arms in town,” as well as, later, “the plantations.” Harper’s Weekly, Jan. 13, 1866, at 19, col. 2. A similar law enacted by a city in Louisiana, which a special report “had brought to Congress’ attention,” for-bad freedmen from carrying firearms or any other kind of weapon within the limits of town without special permission from the government and one’s employer. Hal-brook, supra, at 5; see also “The Freedmen’s Bureau Bill,” New York Evening Post, May 30, 1866, at 2, col. 1 (“In South Carolina and Florida the freedmen are forbidden to wear or keep arms.”).
Among the proposed legislative solutions to the problem of the Black Codes was a bill to add to the powers of the Freedmen’s Bureau, a federal agency dispatched to the South to aid the former slaves. One senator, a Democrat from Indiana, seemed to fear that the bill’s section securing civil rights to blacks would cast doubt on the legitimacy of his state’s laws securing only whites’ right to carry weapons openly. See Halbrook, supra, at 8. Another senator, though he opposed the bill, knew well the nature of the fundamental rights it sought to secure: They included “the subordination of the military to the civil power in peace, in a war, and always,” “the writ of habeas corpus,” and “trial by jury,” he declared. They also included the right “for every man bearing his arms about him and keeping them in his house, his castle, for his own defense.” Cong. Globe, 39th Cong., 1st Sess. 340, 371 (Jan. 23, 1866) (Sen. Henry Winter Davis) (emphasis added), cited in Heller, 554 U.S. at 616, 128 S.Ct. 2783. Meanwhile, in the House, T.D. Eliot, the chairman of the Committee on Freedman’s Affairs, quoted from the Louisiana city ordinance mentioned above, citing its prohibition on “carrying firearms” within the town as an example of the sort of black code that federal legislation securing fundamental rights would undo. Cong. Globe, 39th Cong., 1st Sess. 517 (Jan. 29, 1866). Underscoring the danger that the Southern states’ abridgement of the right portended for blacks, he quoted a letter from a teacher at a black school in Maryland, which told of violence prompting “both the mayor and sheriff [to] warn[] the colored people to go armed to school, (which they do).” She apparently added: “The superintendent of schools came down and brought me a revolver.” Cong. Globe, 39th Cong., 1st Sess. 658 (Feb. 5, 1866). Concerned by such peril, Massachusetts Congressman Nathaniel P. Banks proposed making the language of the act more specific by explicitly listing “the constitutional right to bear arms” among the civil rights protected. Cong. Globe, 39th Cong., 1st Sess. 585 (Feb. 1, 1866). The language made it into both the first bill, which President Johnson vetoed (though he did not object to its arms-bearing provision), as well as the final version, passed by a veto-proof supermajority. Cong. Globe, 39th Cong., 1st Sess. 915-17 (Feb. 19, 1866); Cong. Globe, 39th Cong., 1st Sess. 3842 (July 16,1866).
*1163 Orders of Union commanders charged with managing Reconstruction in the South lend further support to the notion that citizens in the post-Civil War era conceived of the right to bear arms as extending to self-defense outside the home. The Union commanders, who were given authority over various “departments” of the defeated South, issued orders that were just as important to the task of securing the constitutional rights of liberated slaves as Congressional legislation. “To the end that civil rights and immunities may be enjoyed,” General Daniel Sickles issued General Order No. 1 for the Department of South Carolina, stating in part that “[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms, will not be infringed,” though such a guarantee neither foreclosed bans on “the unlawful practice of carrying concealed weapons” nor authorized “any person to enter with arms on the premises of another against his consent.” Cong. Globe, 39th Cong., 1st Sess. 908 (Feb. 17, 1866) (Rep. William Lawrence) (quoting Sickles’ order on the floor of the House). Congressman William Lawrence of Ohio lauded Sickles’ order as just the right medicine. Id. The Loyal Georgian, a known black journal, applauded its issuance, editorializing that blacks “certainly ... have the same right to own and carry arms that other citizens have.” The Loyal Georgian (Augusta), Feb. 3, 1866, 3, col. 4, cited in Heller, 554 U.S. at 615, 128 S.Ct. 2783.
Just as it was “plainly the understanding in the post — Civil War Congress that the Second Amendment protected an individual right to use arms for self-defense,” Heller, 554 U.S. at 616, 128 S.Ct. 2783, it appears that the right was also understood to encompass carrying weapons in public in case of confrontation.
5
We consider next the major “[p]ost— Civil War [c]ommentators[’]” understanding of the right. Id.; see also David B. Kopel, The Second Amendment in the Nineteenth Century, 1998 B.Y.U. L. Rev 1359, 1461-1503 (1998) (collecting relevant commentary from the period). The first and most influential was Thomas Cooley, judge, professor, and author of two leading treatises on constitutional law. Quoted at length in Heller solely for his view that the right is an individual one, Cooley’s works say little on the self-defense component of the right. Nonetheless, his treatment of the Second Amendment in his more popular treatise supports a self-defense view of the right. There, he notes that “happily” there has been “little occasion” for consideration by courts of the extent to which the right may be regulated, citing only— and without disapproval — the pro-carriage decisions in Bliss, Nunn, and a third case on “the right of self-defence.” Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 350 & n.l (1868), cited in Heller, 554 U.S. at 616-17, 128 S.Ct. 2783.[11] Also of note, Cooley observes elsewhere in the book that state constitutions typically secure (among others) the right of each citi *1164 zen to “bear arms for the defence of himself.” Id. at 35-36 (emphasis added). Cooley’s view of the right is thus at least compatible with the mainstream self-defense view and did not preclude certain kinds of defensive weapons bearing.[12] See also Cooley, The General Principles, supra, at 270 (observing that the right was adopted in its inherited English form, “with some modification and enlargement”).
A second constitutional commentator from the era, also cited in Heller, seemed to concur in Cooley’s account. See John Pomeroy, An Introduction to the Constitutional Law of the United States (8th ed.1885), cited in Heller, 554 U.S. at 618, 128 S.Ct. 2788. Though Pomeroy associated the right with the “object” of “securing] a well-regulated militia,” he suggested that, while restrictions on the frowned-upon method of “secret” carrying would not violate the right, restrictions on open carry likely would. Consistent with the majority of nineteenth century courts, Pomeroy did not see “laws forbidding persons to carry dangerous or concealed weapons” alone as incompatible with the Amendment’s “intent and design,” (in contrast with laws barring carry altogether) for the right is not absolute: “Freedom, not license, is secured.” Id. at 152-53.
The observations of Oliver Wendell Holmes Jr. in his annotations to James Kent’s canonical Commentaries on American Law, are in accord. “As the Constitution of the United States ... declare[s] the right of the people to keep and bear arms,” he wrote, “it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons, when not on a journey, or as travellers, from wearing or carrying concealed weapons, be constitutional. There has been a great difference of opinion on the question.” 2 J. Kent, Commentaries on American Law *340 n.2 (Holmes ed., 12th ed.1873), cited in Heller, 554 U.S. at 618, 128 S.Ct. 2783. Reviewing a handful of cases “in favor of’ concealed-carry restrictions and others wholly against it, Holmes tellingly ends with an analysis of Nunn v. State, in which a statutory prohibition on carrying was “adjudged to be valid so far as it goes to suppress the wearing of arms secretly, but unconstitutional so far as it prohibits the bearing or carrying arms openly.” Id. For his own part, Holmes thought a state acting pursuant to its general police power may (and should) prohibit the “atrociously abused” practice of con *1165 cealed carry. Id. Notably, though, he stops short of suggesting that bans on arms bearing altogether would be appropriate, though he was obviously aware that some courts had adopted a more aggressive regulatory posture toward the right.
The account of George Chase, yet another nineteenth-century editor of Blackstone, also reflects the mainstream view of the right — and quite explicitly so. Though the right may not be infringed, he wrote, “it is generally held that statutes prohibiting the carrying of concealed weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence.” The American Students’ Blackstone: Commentaries on the Laws of England 84 n.ll (George Chase ed., 3d ed.1890) [hereinafter “Chase”], cited in Heller, 554 U.S. at 626, 128 S.Ct. 2783.
Legal commentator John Ordronaux, also cited in Heller, understood the right clearly to include arms bearing outside the home. Predating the Constitution, “[t]he right to bear arms has always been the distinctive privilege of freemen,” rooted in part in the “necessity of self-protection to the person.” John Ordronaux, Constitutional Legislation in the United States: Its Origin, and Application to the Relative Powers of Congress, and of State Legislatures 241 (1891), cited in Heller, 554 U.S. at 619, 128 S.Ct. 2783. He described the special province of the privilege in American history: “Exposed as our early colonists were to the attacks of savages, the possession of arms became an indispensable adjunct to the agricultural implements employed in the cultivation of the soil. Men went armed into the field, and went armed to church. There was always public danger.” Id. at 242. Still, for all its robustness, the Amendment has never prevented “a State from enacting laws regulating the manner in which arms may be carried. Thus, the carrying of concealed weapons may be absolutely prohibited without the infringement of any constitutional right, while a statute forbidding the bearing of arms openly would be such an infringement.” Id. at 243 (adding that a state may require a private citizen to “obtain a license in order to be permitted to carry a concealed weapon”). Thus, Ordro-naux squarely comes down'on the side of Nunn and like authorities, affirming in no uncertain terms the right’s viability outside the home.
That position also prevailed, to a greater or lesser extent, in some of the minor late-nineteenth-century commentaries. Henry Campbell Black, Handbook of American Constitutional Law 463 (1895) (noting that, though the arms-bearing privilege belongs to individuals and is a “natural right,” restrictions on carrying concealed weapons are not unconstitutional); James Schouler, Constitutional Studies: State and Federal 226 (1897) (“To the time-honored right of free people to bear arms was now [in the mid-nineteenth-century] annexed, ... the qualification that carrying concealed weapons was not to be included.”); see also, supra, n. 12 (late-nineteenth-century editors oí Blackstone).
That is not to say that this period was without proponents of a dissenting view. Indeed, there were several. See Joel Prentiss Bishop, Commentaries on the Law of Statutory Crimes 497-98 (1873) (disagreeing that the right permits the carrying of weapons for personal self-defense); J.C. Bancroft Davis, “Appendix,” in Samuel Freeman Miller, Lectures on the Constitution of the United States 645 (1893) [hereinafter “Davis”] (understanding the right to secure the characteristic activities of “military bodies and associa *1166 tions”); George Boutwell, The Constitution of the United States at the End of the First Century 358 (1895) (same); 2 John Randolph Tucker, The Constitution of the United States 671-72 (Henry St. George Tucker ed., 1899) (same).[13] Yet, we must accord these commentaries little weight, and for the same reason we discounted the state cases finding no individual or self-defense-based right to keep and bear arms: Heller tells us that they are — and always have been — incorrect interpretations of the nature and scope of the right.
The weight of authority suggests that the right to bear arms, as understood in the post — Civil War legal commentary, included the right to carry weapons outside the home for self-defense, which, as shown, is consistent with the understanding of the right articulated in most eighteenth-century commentary, nineteenth-century court opinions, and by many post — Civil War political actors.
So concludes our analysis of text and history: the carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes “bearing] Arms” within the meaning of the Second Amendment.
6
Our conclusion that the right to bear arms includes the right to carry an operable firearm outside the home for the lawful purpose of self-defense is perhaps unsurprising — other circuits faced with this question have expressly held, or at the very least have assumed, that this is so. Moore, 702 F.3d at 936 (“A right to bear arms thus implies a right to carry a loaded gun outside the home.”); see also, e.g., Drake, 724 F.3d at 431 (recognizing that the Second Amendment right “may have some application beyond the home”); Woollard v. Gallagher, 712 F.3d 865, 876 (4th Cir.2013) (“We ... assume that the Heller right exists outside the home.... ”); Kachalsky, 701 F.3d at 89 (assuming that the Second Amendment “must have some application in the very different context of the public possession of firearms”).
Given this consensus, one might consider it odd that we have gone to such lengths to trace the historical scope of the Second Amendment right. But we have good reason to do so: we must fully understand the historical scope of the right before we can determine whether and to what extent the San Diego County policy burdens the right or whether it goes even further and “amounts to a destruction of the right” altogether. See Heller, 554 U.S. at 629, 128 S.Ct. 2783 (quoting Reid, 1 Ala. at 616-17). Heller instructs that text and history are our primary guides in that inquiry.
*1167 One of Hellers most important lessons is that the Second Amendment “codif[ies] a pre-existing right” whose contours can be understood principally through an evaluation of contemporaneous accounts by courts, legislators, legal commentators, and the like. Heller, 554 U.S. at 603, 605, 128 S.Ct. 2783; see also McDonald, 130 S.Ct. at 3056-57 (Scalia, J., concurring) (“The traditional restrictions [on the keeping and bearing of arms] go to show the scope of the right.”). Tracing the scope of the right is a necessary first step in the constitutionality analysis-and sometimes it is the dispositive one. See Heller, 554 U.S. at 628-35, 128 S.Ct. 2783. “[C]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them....” Id. at 634-35, 128 S.Ct. 2783. A law that “under the pretence of regulating, amounts to a destruction of the right” would not pass constitutional muster “[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights.” Id. at 628-29, 128 S.Ct. 2783. Put simply, a law that destroys (rather than merely burdens) a right central to the Second Amendment must be struck down. Id.
We thus disagree with those courts— including the district court in this case— that have taken the view that it is not necessary (and, thus, necessary not) to decide whether carrying a gun in public for the lawful purpose of self-defense is a constitutionally protected activity. See, e.g., Drake, 724 F.3d at 431; Woollard, 712 F.3d at 876; Kachalsky, 701 F.3d at 89; cf. Masciandaro, 638 F.3d at 475. Understanding the scope of the right is not just necessary, it is key to our analysis. For if self-defense outside the home is part of the core right to “bear arms” and the California regulatory scheme prohibits the exercise of that right, no amount of interest-balancing under a heightened form of means-ends scrutiny can justify San Diego County’s policy. See Heller, 554 U.S. at 634, 128 S.Ct. 2783 (“The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is really worth insisting upon.”).
B
Having concluded that carrying a gun outside the home for self-defense comes within the meaning of “bearing] Arms,” we ask whether San Diego County’s “good cause” permitting requirement “infringe[s]” the right.
1
a
To determine what constitutes an infringement, our sister circuits have grappled with varying sliding-scale and tiered-scrutiny approaches, agreeing as a general matter that “the level of scrutiny applied to gun control regulations depends on the regulation’s burden on the Second Amendment right to keep and bear arms.” Nor-dyke v. King, 681 F.3d 1041, 1045-46 (9th Cir.2012) (en banc) (O’Scannlain, J., concurring) (collecting cases); see Heller II, 670 F.3d at 1257 (requiring a “strong justification” for regulations imposing a “substantial burden upon the core right of self-defense”); Ezell, 651 F.3d at 706, 708 (applying more demanding scrutiny to “severe burden[s] on the core Second Amendment right”); Masciandaro, 638 F.3d at 469-70 (requiring “strong justifieation[s]” for “severe burden[s] on the core Second Amendment right” (quoting Chester, 628 F.3d at 682-83)); Marzzarella, 614 F.3d at 97 (calibrating the level of scrutiny to the “severity” of the burden imposed). Under this general approach, severe restrictions on the “core” right have been thought to trigger a kind of strict scrutiny, while less *1168 severe burdens have been reviewed under some lesser form of heightened scrutiny. See, e.g., United States v. Decastro, 682 F.3d 160, 166 (2d Cir.2012); Heller II, 670 F.3d at 1257; Masciandaro, 638 F.3d at 470; Chester, 628 F.3d at 682. Confronting challenges to curtailments of the right to carry, one court has applied “some form of heightened scrutiny ... less than strict scrutiny.” Kachalsky, 701 F.3d at 93-94. Another, eschewing a tiered approach, required the state to “justif[y]” the burden. Moore, 702 F.3d at 941 (“Our analysis is not based on degrees of scrutiny, but on Illinois’s failure to justify the most restrictive gun law of any of the 50 states.”). Still another has applied intermediate scrutiny. See Woollard, 712 F.3d at 876.
And there is, of course, an alternative approach for the most severe cases — the approach used in Heller itself. In Heller, applying heightened scrutiny was unnecessary. No matter what standard of review to which the Court might have held the D.C. restrictions,[14] “banning from the home the most preferred firearm in the nation to keep and use for protection of one’s home and family would fail constitutional muster.” Id. at 628-29, 128 S.Ct. 2783 (internal quotation marks and citation omitted). A law effecting a “destruction of the right” rather than merely burdening it is, after all, an infringement under any light. Heller, 554 U.S. at 629, 128 S.Ct. 2783 (emphasis added) (quoting Reid, 1 Ala. at 616-17); see also Heller II, 670 F.3d at 1271 (Kavanaugh, J., dissenting) (“In my view, Heller and McDonald leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.”).[15]
b
Our first task, therefore, is to assess the nature of the infringement that the San Diego County policy purportedly effects on the right to bear arms — namely, does it burden the right or, like in Heller, does it destroy the right altogether?
California’s regulatory scheme addresses two types of arms-bearing: open and concealed carry. Under California law, open carry is prohibited in San Diego County[16] regardless of whether the weapon is loaded or unloaded. See Cal.Penal Code §§ 25850, 26350. Because California law has no permitting provision for open carry, cf. id. §§ 26150, 26155 (providing licensing only for concealed carry), it is illegal in virtually all circumstances.
California law also severely restricts concealed carry, although not to the same extent as open carry. As a general rule, concealed carry is not allowed regardless of whether the weapon is loaded. See id. § 25400. But there are certain exceptions. Concealed carry is acceptable with a proper permit. Id. §§ 26150, 26155. And even without a permit, it is sanctioned for particular groups, see, e.g., id. § 25450 (peace officers); id. § 25455 (retired peace officers); id. § 25620 (military personnel); id. § 25650 (retired federal officers), in partic *1169 ular locations, see, e.g., id. § 26035 (private property or place of business); id. § 26040 (where hunting is allowed), and at particular times, see, e.g., id. § 26045 (when faced with “immediate, grave danger” in the “brief interval before and after the local law enforcement agency ... has been notified of the danger and before the arrival of its assistance); id. § 26050 (making or attempting to make a lawful arrest).
Clearly, the California scheme does not prevent every person from bearing arms outside the home in every circumstance. But the fact that a small group of people have the ability to exercise their right to bear arms does not end our inquiry. Because the Second Amendment “confer[s] an individual right to keep and bear arms,” we must assess whether the California scheme deprives any individual of his constitutional rights. Heller, 554 U.S. at 595, 128 S.Ct. 2783. Thus, the question is not whether the California scheme (in light of San Diego County’s policy) allows some people to bear arms outside the home in some places at some times; instead, the question is whether it allows the typical responsible, law-abiding citizen to bear arms in public for the lawful purpose of self-defense. The answer to the latter question is a resounding “no.”[17]
In California, the only way that the typical responsible, law-abiding citizen can carry a weapon in public for the lawful purpose of self-defense is with a.concealed-carry permit. And, in San Diego County, that option has been taken off the table. The San Diego County policy specifies that concern for “one’s personal safety alone” does not satisfy the “good cause” requirement for issuance of a permit. Instead, an applicant must demonstrate that he suffers a unique risk of harm: he must show “a set of circumstances that distinguish [him] from the mainstream and cause[ ] him ... to be placed in harm’s way.” Given this requirement, the “typical” responsible, law-abiding citizen in San Diego County cannot bear arms in public for self-defense; a typical citizen fearing for his “personal safety” — by definition — cannot “distinguish [himself ] from the mainstream.”
Although California law provides other specified exceptions from the general prohibition against public carry, these do little to protect an individual’s right to bear arms in public for the lawful purpose of self-defense. The exemptions for particular groups of law enforcement officers and military personnel do not protect the typical responsible, law-abiding citizen. Excluding private property and places of business does not protect the right to bear arms for public confrontation. And the exceptions for “making or attempting to make a lawful arrest” or for situations of “immediate, grave danger” (to the extent that they are not entirely illusory — for how would one obtain a gun for use in public when suddenly faced with such a circumstance?) do not cover the scope of the right, which includes the right to carry in case of public confrontation, not just after a confrontation has occurred. Heller, 554 U.S. at 584, 128 S.Ct. 2783 (defining bear arms to mean carrying a weapon “for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.” (emphasis added)) (quoting Muscarello, 524 U.S. at 143, 118 S.Ct. 1911 (Ginsburg, J., dissenting)). To reason by analogy, it is as though San Diego County banned all polit *1170 ical speech, but exempted from this restriction particular people (like current or former political figures), particular places (like private property), and particular situations (like the week before an election). Although these exceptions might preserve small pockets of freedom, they would do little to prevent destruction of the right to free speech as a whole. As the Court has said: “The Second Amendment is no different.” Heller, 554 U.S. at 635, 128 S.Ct. 2783. It too is, in effect, destroyed when exercise of the right is limited to a few people, in a few places, at a few times.
c
It is the rare law that “destroys” the right, requiring Heller-style per se invalidation, but the Court has made perfectly clear that a ban on handguns in the home is not the only act of its kind. We quote the relevant paragraph in full, telling case citations included:
Few laws in the history of our Nation have come close to the severe restriction of the District’s handgun ban. And some of those few have been struck down. In Nunn v. State, the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). See 1 Ga., at 251. In Andrews v. State, the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol “publicly or privately, without regard to time or place, or circumstances,” 50 Tenn., at 187, violated the state constitutional provision (which the court equated with the Second Amendment). That was so even though the statute did not restrict the carrying of long guns. Ibid. See also State v. Reid, 1 Ala. 612, 616-617 (1840) (“A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional”).
Id. at 629, 128 S.Ct. 2783. In other words, D.C.’s complete ban on handguns in the home amounted to a destruction of the right precisely because it matched in severity the kinds of complete carry prohibitions confronted (and struck down) in Nunn and Andrews. These, in turn, resemble the severe restrictions in effect in San Diego County, where the open or concealed carriage of a gun, loaded or not, is forbidden. Heller teaches that a near-total prohibition on keeping arms (Heller) is hardly better than a near-total prohibition on bearing them (this case), and vice versa. Both go too far.
2
The County presents one further argument in support of the constitutionality of its “good cause” policy, which it perceives as its ace in the hole: the Heller Court’s description of concealed-carry restrictions as “presumptively lawful regulatory measures.” Id. at 627 n. 26, 128 S.Ct. 2783. “The right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose,” Heller says. Id. at 626, 128 S.Ct. 2783. “For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment and state analogues.” Id. According to the County, this means that their concealed-carry policy (which stops just short of an all-out ban) must also be lawful. Ergo, this suit must fail.
But the County’s argument has two flaws. First, it misapprehends Peruta’s challenge. This is not a case where a plaintiff who is permitted to openly carry a loaded weapon attacks the validity of a state’s concealed-carry rule because he *1171 would rather carry secretly. Rather, Per-uta and his fellow plaintiffs argue that the San Diego County policy in light of the California licensing scheme as a whole violates the Second Amendment because it precludes a responsible, law-abiding citizen from carrying a weapon in public for the purpose of lawful self-defense in any manner. True, Peruta focuses his challenge on the licensing scheme for concealed carry, but for good reason: acquiring such a license is the only practical avenue by which he may come lawfully to carry a gun for self-defense in San Diego County. See CaLPenal Code §§ 26150, 26155 (creating a licensing scheme for concealed carry only). As we have explained, open carry is prohibited in San Diego County, and elsewhere in California, without exception. See id. §§ 25850, 26350. It is against this backdrop of the California carry regime at large, Peruta argues, that the unconstitutionality of the County’s restrictive interpretation of “good cause” becomes apparent. His is not an attack trained on a restriction against concealed carry as such, or viewed in isolation. Rather, he targets the constitutionality of the entire scheme and requests the least intrusive remedy: that the County of San Diego, in line with many of the other counties in the State of California, should be made to issue carry licenses to citizens whose only “good cause” is the Heller-approved desire for self-defense.
The second, somewhat-related mistake in the County’s argument is that it reads too much into Helleds ostensible blessing of concealed-carry restrictions. A flat-out ban on concealed carry in a jurisdiction permitting open carry may or may not infringe the Second Amendment right— the passage from Heller clearly bears on that issue, which we need not decide. But whether a state restriction on both concealed and open carry overreaches is a different matter. To that question, Heller itself furnishes no explicit answer. But the three authorities it cites for its statement on concealed-carry laws do. See Heller, 554 U.S. at 626, 128 S.Ct. 2783. We have analyzed all three already. The first, State v. Chandler, stands for the principle that laws prohibiting the carry of concealed weapons are valid only so long as they do not destroy the right to carry arms in public altogether. See 5 La.Ann. at 489-90 (“[The Act] interfered with no man’s right to carry arms (to use its words) ‘in full open view,’ which places men upon an equality.”); see also Jumel, 13 La.Ann. at 400 (citing Chandler for the principle that “prohibiting only a particular mode of bearing arms ... found dangerous” does not infringe the right). The second, Nunn v. State, was even more explicit: “A law which merely inhibits the wearing of certain weapons in a concealed manner is valid. But so far as it cuts off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, renders the right itself useless — it is in conflict with the Constitution, and void.” 1 Ga. at 243. Helleds third and final source, Chase’s American Students’ Blackstone, takes a similar stance, concluding that, though the Constitution forbids the infringement of the right to bear arms, “statutes prohibiting the carrying of concealed weapons are not in conflict with [it or its state analogues], since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence.” Chase, supra, at 84 n. 11.
Of course, these three sources are not the only exponents of this view. As we have shown, dozens of other cases and authorities from the same period — many of which Heller cites as probative of the *1172 right’s original meaning—contend likewise. See,- e.g., Reid, 1 Ala. at 616-17 (striking down a concealed carry law because “the Legislature[ has] the right to enact laws in regard to the manner in which arms shall be borne,” but noting that a statute that destroys the right altogether under the “pretence of regulating” the manner of carry “would be clearly unconstitutional”); Bliss, 12 Ky. (2 Litt.) at 91 (holding that a ban on concealed carry, which “restrain[ed] the full and complete exercise of [the] right,” was unconstitutional and void). As Judge Hardiman aptly summarized “courts have long h[eld] that although a State may prohibit the open or concealed carry of firearms, it may not ban both because a complete prohibition on public carry violates the Second Amendment and analogous state constitutional provisions.” Drake, 724 F.3d at 449 (Har-diman, J., dissenting).
To be clear, we are not holding that the Second Amendment requires the states to permit concealed carry. But the Second Amendment does require that the states permit some form of carry for self-defense outside the home. Historically, the preferred form of carry has depended upon social convention: concealed carry was frowned upon because it was seen as “evil practice” that endangered “the safety of the people” and “public morals” by “exert[ing] an unhappy influence upon the moral feelings of the wearer[ and] making him less regardful of the personal security of others.” Reid, 1 Ala. at 616-17. States thus often passed laws banning concealed carry and state courts often allowed prohibitions on concealed carry so long as open carry was still permitted. Id.; see also Nunn, 1 Ga. at 251 (“[S]o far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, th[en] it is valid.... But [to the extent it] contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void.”).
California, through its legislative scheme, has taken a different course than most nineteenth-century state legislatures, expressing a preference for concealed rather than open carry.[18] See Cal.Penal Code § 26350 (prohibiting open carry of an unloaded firearm); see also id. §§ 26150, 26155 (establishing a licensing procedure only for concealed carry). And it has the power to do so: as the historical sources have repeatedly noted, the state has a right to prescribe a particular manner of carry, provided that it does not “cut[ ] off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, render[ ] the right itself useless.” Nunn, 1 Ga. at 243 (emphasis omitted). California’s favoring concealed carry over open carry does not offend the Constitution, so long as it allows one of the two.
To put it simply, concealed carry per se does not fall outside the scope of the right to bear arms; but insistence upon a particular mode of carry does. As we have explained previously, this is not the latter type of case. Peruta seeks a concealed carry permit because that is the only type of permit available in the state. As the California legislature has limited its permitting scheme to concealed carry— and has thus expressed a preference for that manner of arms-bearing—a narrow challenge to the San Diego County regulations on concealed carry, rather than a *1173 broad challenge to the state-wide ban on open carry, is permissible.[19]
For these reasons, Heller*s favorable mention of concealed-carry restrictions is not the silver bullet the County had hoped it was, at least not in this case.
3
Our opinion is not the first to address the question of whether the Second Amendment protects a responsible, law-abiding citizen’s right to bear arms outside the home for the lawful purpose of self-defense. Indeed, we are the fifth circuit court to opine expressly on the issue, joining an existent circuit split. Compare Moore, 702 F.3d at 936-42 (holding that “[a] right to bear arms ... implies a right to carry a loaded gun outside the home” and striking down the open-and-concealed-carry regulatory regime in Illinois because the state failed to justify “so substantial a curtailment of the right of armed self-defense”), with Drake, 724 F.3d at 431-35 (recognizing that the right to bear arms may have some application outside the home, but concluding that New Jersey’s “justifiable need” permitting requirement was a presumptively lawful longstanding regulation or, alternatively, that the New Jersey regulatory scheme survived intermediate scrutiny); Woollard, 712 F.3d at 876, 879-82 (presuming that Second Amendment protections exist outside the home and upholding Maryland’s regulatory scheme because it could not “substitute [a different] view[ ] for the considered judgment of the General Assembly,” which “appropriate[ly] balance[d]” the interests involved), and Kachalsky, 701 F.3d at 89, 97-99 (proceeding on the “assumption” that the right to bear arms extends outside the home, but affording “substantial deference to the predictive judgments of [the legislature]” and thus upholding the gun regulations under intermediate scrutiny). Our reading of the Second Amendment is akin to the Seventh Circuit’s interpretation in Moore, 702 F.3d at 936-42,[20] and at odds with the approach of the Second, Third, and Fourth Circuits in Drake, 724 F.3d at 431-35, Woollard, 712 F.3d at 876, and Kachalsky, 701 F.3d at 89, 97-99.
a
We are unpersuaded by the decisions of the Second, Third, and Fourth Circuits for several reasons. First, contrary to the approach in Heller, all three courts declined to undertake a complete historical analysis of the scope and nature of the Second Amendment right outside the home. Compare Heller, 554 U.S. at 605, 128 S.Ct. 2783 (examining the post-ratification interpretations of the Second Amendment because “the public understanding of a legal text in the period after its enactment or ratification” is “a critical tool of constitutional interpretation” (emphasis omitted)), with Drake, 724 F.3d at 431 (noting that the court was “not inclined to address [text, history, tradition and precedent] by engaging in a round of full-blown historical analysis” and relying on the Second Circuit’s conclusion that “[h]istory and tradition do not speak with one voice” (quoting Kachalsky, 701 F.3d at 91)); Woollard, 712 F.3d at 874-76 (declining to “impart a definitive ruling” regarding the scope of the Second Amendment right), *1174 and Kachalsky, 701 F.3d at 91 (refusing to look at “highly ambiguous history and tradition to determine the meaning of the Amendment”). As a result, they misapprehend both the nature of the Second Amendment right and the implications of state laws that prevent the vast majority of responsible, law-abiding citizens from carrying in public for lawful self-defense purposes.
For example, in Kachalsky, the Second Circuit’s perfunctory glance at the plaintiffs’ historical argument misunderstood the historical consensus regarding the right to bear arms outside the home. Relying on three cases, the court concluded that “history and tradition [did] not speak with one voice” regarding the ability to restrict public carry because at least three states “read restrictions on the public carrying of weapons as entirely consistent with constitutional protections.” Kachalsky, 701 F.3d at 90-91 (citing Fife v. State, 31 Ark. 455 (1876), English, 35 Tex. at 473, and Andrews v. State, 50 Tenn. 165 (1871)). But in its brief historical analysis, the court missed a critical factor: the cases it cites in favor of broad public carry restrictions adhere to a view of the Second Amendment that is and always has been incorrect. Cf. Moore, 702 F.3d at 941 (referencing “disagreement ... with some of the historical analysis in [Kachalsky because] we regard the historical issues as settled in Heller ”). All three cases interpret the Second Amendment as a militia-based (rather than a self-defense-centered) right; they uphold regulations on carrying pistols in public because pistols are not the type of weapons that would be used by militia men. See Fife, 31 Ark. at 461 (upholding a prohibition against carrying pistols in public because such weapons are “used in private quarrels and brawls” and are not “effective as a weapon of war, and useful and necessary for ‘the common defense’ ”); English, 35 Tex. at 475 (“[W]e shall be led to the conclusion that the [Second Amendment] protects only the right to ‘keep’ such ‘arms’ as are used for purposes of war, in distinction from those which are employed in quarrels and broils, and fights between maddened individuals....”); Andrews, 50 Tenn. at 186-87 (affirming the constitutionality of a law regulating public carry of certain weapons which were not the “usual equipment of the soldier” but remanding for consideration of whether a revolver was the “character of weapon” used in warfare).
Because the Second Amendment has always been an individual right to defend oneself, cases that — like these — uphold gun regulations because they do not offend the militia-based nature of the right are inapposite and should not factor into a historical analysis of the right’s scope. See, e.g., Heller, 554 U.S. at 605, 128 S.Ct. 2783. And with these cases off the table, the remaining cases speak with one voice: states may not destroy the right to bear arms in public under the guise of regulating it. See, e.g., Kachalsky, 701 F.3d at 90 (recognizing that some state courts “offered interpretations of the Second Amendment” consistent with the plaintiffs’ position that “though a state may regulate open or concealed carrying of handguns, it cannot ban both”); see also Drake, 724 F.3d at 449 (Hardiman, J., dissenting) (noting that the “crux of the[ ] historical precedents[] endorsed by the Supreme Court, is that a prohibition against both open and concealed carry without a permit is different in kind, not merely in degree, from a prohibition covering only one type of carry”). In light of Heller, the Second Circuit erred in outright rejecting history and tradition as unhelpful and ambiguous, and the Third and Fourth Circuits erred in *1175 following suit.[21] See Kachalsky, 701 F.3d at 91; see also Drake, 724 F.3d at 431; Woollard, 712 F.3d at 875-76.
By evading an in-depth analysis of history and tradition, the Second, Third, and Fourth Circuits missed a crucial piece of the Second Amendment analysis. They failed to comprehend that carrying weapons in public for the lawful purpose of self defense is a central component of the right to bear arms. See Moore, 702 F.3d at 941 (criticizing the court in Kachalsky for “suggesting] that the Second Amendment should have a much greater scope inside the home than outside” and noting that the “interest in self-protection [and thus in the Second Amendment right] is as great outside as inside the home”). And further, they failed to comprehend that regulations on the right, although permissible to an extent, could not go so far as to enjoin completely a responsible, law-abiding citizen’s right to carry in public for self-defense. Such regulations affecting a destruction of the right to bear arms, just like regulations that affect a destruction of the right to keep arms, cannot be sus-tamed under any standard of scrutiny. See Heller, 554 U.S. at 629, 128 S.Ct. 2783.
Because the Second, Third, and Fourth Circuits eschewed history and tradition in their analysis of the constitutionality of these regulations, despite the Supreme Court’s admonition that “the public understanding of a legal text in the period after its enactment or ratification” is a “critical tool of constitutional interpretation,” we find their approaches unpersuasive. See Heller, 554 U.S. at 605, 128 S.Ct. 2783. Our independent analysis of history and tradition leads us to take a different course.
b
Because our analysis paralleled the analysis in Heller itself, we did not apply a particular standard of heightened scrutiny. See also Moore, 702 F.3d at 941 (declining to subject the “most restrictive gun law of any of the 50 states” to an “analysis ... based on degrees of scrutiny”). Thus, the Second, Third, and Fourth Circuits’ extensive discussions regarding the application of intermediate scrutiny to similar regulations in other states is not particularly *1176 instructive to our view of the issues in this case.
Nonetheless, to the extent those opinions suggest that the type of regulation at issue here can withstand some form of heightened scrutiny, it is worth noting our disagreement with their reasoning.
When analyzing whether a “substantial relationship” existed between the challenged gun regulations and the goal of “public safety and crime prevention” the Second Circuit concluded that it owed “substantial deference to the predictive judgments of [the legislature]” regarding the degree of fit between the regulations and the public interest they aimed to serve. Kachalsky, 701 F.3d at 97. Relying on New York’s historical regulation of handguns from 1911 to the present, the court deferred to the state legislature’s “belief’ that regulation of handgun possession would have “an appreciable impact on public safety and crime prevention.” Id. at 97-98. It thus upheld New York’s regulatory scheme, emphasizing that there was “general reticence to invalidate the acts of [our] elected leaders.” Id. at 100 (citing Nat’l Fed’n of Indep. Bus. v. Sebeli-us, - U.S. -, 132 S.Ct. 2566, 2579, 183 L.Ed.2d 450 (2012)). Taking a similar approach, the Third Circuit deferred to the legislature’s judgment that the permitting regulations would serve its interest in ensuring public safety even though “New Jersey [could not] presentf] [the court] with much evidence to show how or why its legislators arrived at this predictive judgment.” Drake, 724 F.3d at 437; see also id. at 454 (Hardiman, J., dissenting) (clarifying that in actuality “New Jersey ... provided no evidence at all to support its proffered justification ... ”). And the Fourth Circuit, in a familiar vein, relied on the legislature’s judgment that “reducing] the number of handguns carried in public” would increase public safety and prevent crime, despite conflicting evidence on the issue. Woollard, 712 F.3d at 879-82.
This is not an appropriate application of intermediate scrutiny in at least two respects. First, the analysis in the Second, Third, and Fourth Circuit decisions is near-identical to the freestanding “interest-balancing inquiry” that Justice Breyer proposed — and that the majority explicitly rejected — in Heller. See Heller, 554 U.S. at 689-90, 128 S.Ct. 2783 (Breyer, J., dissenting) (proposing that in Second Amendment eases the court should “ask[ ] whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute’s salutary effects upon other important governmental interests”); see also id. at 634-35, 128 S.Ct. 2783 (majority opinion) (rejecting a “judge-empowering ‘interest-balancing inquiry’ ” as a test for the constitutionality of Second Amendment regulations because “no other enumerated constitutional right [had its] core protection ... subjected to [such] a freestanding” inquiry). All three courts referenced, and ultimately relied upon, the state legislatures’ determinations weighing the government’s interest in public safety against an individual’s interest in his Second Amendment right to bear arms. See Kachalsky, 701 F.3d at 100 (deferring to the state legislature’s determination “that limiting handgun possession to persons who have an articuable basis for believing they will need the weapon for self-defense is in the best interest of public safety and outweighs the need to have a handgun for an unexpected confrontation” (emphasis added)); see also Drake, 724 F.3d at 439 (noting that “New Jersey has decided that this somewhat heightened risk to the public may be outweighed by the potential safety benefit to an individual with a justifiable need to carry a handgun” (emphasis added) (internal quotation marks omitted)); Woollard, 712 F.3d at 880 (relying on the state’s determination that “the *1177 good-and-substantial-reason requirement ‘strikes a proper balance between ensuring access to handgun permits for those who need them while preventing a greater-than-necessary proliferation of handguns in public places that ... increases risks to public safety.’ ” (emphasis added)). As we previously explained, such an approach ignores the Heller court’s admonition that “the very enumeration of the right takes out of the hands of government ... the power to decide on a case-by-case basis whether the right is really worth insisting upon.” Heller, 554 U.S. at 634, 128 S.Ct. 2783; see also Drake, 724 F.3d at 457 (Hardiman, J., dissenting) (recognizing that the Heller court “rejected this sort of balancing inquiry as inconsistent with the very idea of constitutional rights”).
Our second disagreement with our sister circuits’ application of intermediate scrutiny relates to the high degree of deference they afforded the state legislatures’ assessments of the fit between the challenged regulations and the asserted government interest they served. Although all three cite Turner Broadcasting System, Inc. v. FCC (Turner II), 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), for the proposition that courts must afford deference to legislative findings, they apply this premise in the wrong context. See Drake, 724 F.3d at 436-37; Woollard, 712 F.3d at 881; Kachalsky, 701 F.3d at 97. In Part II.A. of Turner, the Court applied deference to the legislature’s judgment regarding the first portion of the intermediate scrutiny analysis: whether there was a “real harm” amounting to an important government interest and “whether [the statutory provisions at issue] will alleviate it in a material way.” Turner, 520 U.S. at 195, 117 S.Ct. 1174. But in Part II.B, when assessing “the fit between the asserted interests and the means chosen to advance them,” the Court applied no such deference. Id. at 213, 117 S.Ct. 1174. Instead, it required the government to prove that the statute did not burden the right “ ‘substantially more ... than is necessary to further’ [the government’s legitimate] interests.” Id. at 214, 117 S.Ct. 1174 (quoting Turner Broadcasting System, Inc. v. FCC (Turner I), 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).
In Drake, Woollard, and Kachalsky, the government failed to show that the gun regulations did not burden “substantially more” of the Second Amendment right than was necessary to advance its aim of public safety. Indeed, as the district court noted in Woollard, the government could not show that the challenged regulation served its needs any better than a random rationing system, wherein gun permits were limited to every tenth applicant. See also Drake, 724 F.3d at 455 (Hardiman, J., dissenting) (“[I]t is obvious that the justifiable need requirement [in New Jersey] functions as a rationing system designed to limit the number of handguns carried in [the state].”). As that court so aptly put it:
The Maryland statute’s failure lies in the overly broad means by which it seeks to advance this undoubtedly legitimate end. The requirement that a permit applicant demonstrate “good and substantial reason” to carry a handgun does not, for example, advance the interests of public safety by ensuring that guns are kept out of the hands of those adjudged most likely to misuse them, such as criminals or the mentally ill. It does not ban handguns from places where the possibility of mayhem is most acute, such as schools, churches, government buildings, protest gatherings, or establishments that serve alcohol. It does not attempt to reduce accidents, as would a requirement that all permit applicants complete a safety course. It does not even, as some other States’ *1178 laws do, limit the carrying of handguns to persons deemed “suitable” by denying a permit to anyone “whose conduct indicates that he or she is potentially a danger to the public if entrusted with a handgun.”
Rather, the regulation at issue is a rationing system. It aims, as Defendants concede, simply to reduce the total number of firearms carried outside of the home by limiting the privilege to those who can demonstrate “good reason” beyond a general desire for self-defense.
The challenged regulation does no more to combat [the state’s public safety concerns] than would a law indiscriminately limiting the issuance of a permit to every tenth applicant. The solution, then, is not tailored to the problem it is intended to solve. Maryland’s “good and substantial reason” requirement will not prevent those who meet it from having their guns taken from them, or from accidentally shooting themselves or others, or from suddenly turning to a life of crime.... If anything, the Maryland regulation puts firearms in the hands of those most likely to use them in a violent situation by limiting the issuance of permits to “groups of individuals who are at greater risk than others of being the victims of crime.”
Woollard v. Sheridan, 863 F.Supp.2d 462, 474-75 (D.Md.2012) (internal citations and quotation marks omitted), rev’d sub nom. Woollard, 712 F.3d at 865; see also City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417-18, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (holding that the “city did not establish the reasonable fit” between a regulation prohibiting the distribution of commercial handbills and a government interest in safety and esthetics and rejecting the city’s argument that it could show “a close fit between its ban on newsracks dispensing ‘commercial handbills’ and its interest in safety and esthetics because every decrease in the number of such dispensing devices necessarily effected] an increase in safety and an improvement in the attractiveness of the cityscape.”).
In light of the states’ failure to demonstrate sufficient narrow tailoring in Drake, Woollard, and Kachalsky, the gun regulations at issue in those cases should have been struck down even under intermediate scrutiny.
Ill
We conclude by emphasizing, as nearly every authority on the Second Amendment has recognized, regulation of the right to bear arms is not only legitimate but quite appropriate. We repeat Helleds admonition that “nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession” — or carriage — “of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” Heller, 554 U.S. at 626-27, 128 S.Ct. 2783. Nor should anything in this opinion be taken to cast doubt on the validity of measures designed to make the carrying of firearms for self-defense as safe as possible, both to the carrier and the community.
We are well aware that, in the judgment of many governments, the safest sort of firearm-carrying regime is one which restricts the privilege to law enforcement with only narrow exceptions. Nonetheless, “the enshrinement of constitutional rights necessarily takes certain policy choices off the table.... Undoubtedly some think that the Second Amendment is outmoded in a society where our standing *1179 army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court [or ours] to pronounce the Second Amendment extinct.” Id. at 636, 128 S.Ct. 2783. Nor may we relegate the bearing of arms to a “second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause.” McDonald, 130 S.Ct. at 3044.
The district court erred in denying the applicant’s motion for summary judgment on the Second Amendment claim because San Diego County’s “good cause” permitting requirement impermissibly infringes on the Second Amendment right to bear arms in lawful self-defense.[22]
REVERSED and REMANDED.

. There are a few narrow exceptions to this rule. Armored vehicle guards and retired federal officers may carry a loaded firearm in public without meeting stringent permitting requirements. See Cal.Penal Code § 26015 (armored vehicle guards); id. § 26020 (retired federal officers). And a citizen may carry a loaded firearm in public if: (1) he is engaged in the act of attempting to make a lawful arrest; (2) he is hunting in locations where it is lawful to hunt; or (3) he faces immediate, grave danger provided that the weapon is only carried in "the brief interval” between the time law enforcement officials are notified of the danger and the time they arrive on the scene (where the fleeing victim would obtain a gun during that interval is apparently left to Providence). Id. § 26040 (hunting); id. § 26045 (immediate, grave danger); id. § 26050 (attempting to make a lawful arrest).

. In this case, as in Heller, we consider the scope of the right only with respect to responsible, law-abiding citizens. See Heller, 554 U.S. at 635, 128 S.Ct. 2783 ("And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.”). With respect to irresponsible or non-law-abiding citizens, a different analysis — which we decline to undertake here — applies. Chovan, 735 F.3d at 1138 (holding that a statute "does not implicate this core Second Amendment right [if] it regulates firearm possession for individuals with criminal convictions”); see also Heller, 554 U.S. at 626, 128 S.Ct. 2783 ("[N]oth-ing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill....”).

. Although we are dealing with the Second Amendment right as incorporated against the states through the Fourteenth Amendment, we — consistent with the Court’s analysis in *1152 McDonald — assume that the right had the same scope at the time of incorporation as it did at the time of the founding. See, e.g., 130 S.Ct. at 3036 (using the definition of the Second Amendment right espoused in Heller when analyzing incorporation against the states).

. Heller and McDonald focus on the Second Amendment right to keep and bear arms for self-defense — the core component of the right, which this case implicates. We need not consider, therefore, whether the right has other ends. See Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L.Rev. 1443, 1448 (2009) (suggesting that the right "may have other components,” such as the right to keep and bear arms for recreation, hunting, or resisting government tyranny).

.Following Heller, we credit nineteenth-century judicial interpretations of the right to bear arms as probative of the Second Amendment’s meaning. Heller, 554 U.S. at 586, 128 S.Ct. 2783; id. at 605, 128 S.Ct. 2783 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century-”)-
We decline, however, to undertake an exhaustive analysis of twentieth-century interpretations of the right for the same reason that the Heller Court presumably did: coming over a hundred years after the Amendment’s ratification, they seem poor sources of the text's original public meaning. Cf. id. at 614, 128 S.Ct. 2783 (“Since discussions [in Congress and elsewhere after the Civil War] took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.”).

. We will inevitably miss some. The briefs filed in this appeal were able to address only so many before running up against word limits.

. With apologies to George Orwell. See George Orwell, Animal Farm 118 (2009) (1945) (distilling Manor Farm’s Seven Commandments of Animalism to a single rule: "All animals are equal, but some animals are more equal than others”).

. The Indiana Supreme Court appeared to take the same view. Compare State v. Mitchell, 3 Blackf. 229 (Ind.1833) (publishing a one-sentence opinion that reads, "It was held in this case, that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional.”) with Walls v. State, 7 Blackf. 572, 573 (Ind.1845) (implying that a citizen could avoid legal trouble under the concealed weapons law if "he exhibited his pistol so frequently that it could not be said to be concealed”).

. By assuming that the right to bear arms is an individual one focused on militia service rather than self-defense, the Chief Judge Ringo's opinion in Buzzard falls into the second-category; Judge Dickinson’s opinion for the majority is consistent with the third-category position in concluding that the Second Amendment does not secure an individual right at all.

. The court rested this holding on the Texas constitution’s guarantee of the right to bear arms, not that of the Second Amendment, which it read as a strictly tyranny-deterring measure "based on the idea, that the people cannot be effectually oppressed and enslaved, who are not first disarmed.” Cockrum, 24 Tex. at 410. Though Heller, of course, rejects such a reading as contrary to the Amend-merit's original meaning, Cockrum retains probative value for purposes of our analysis, as it "illustrates the thesis that, when an antebellum court concluded that a constitutional right to bear arms had a self-defense component, then this normally entailed presumptive carry rights, even as applied to a very potent and dangerous weapon such as the Bowie knife.” O’Shea, supra, at 632.

. The editors of an 1875 edition of Blackstone also highlighted these three cases in their discussion of "[t]he right of carrying arms for self-protection.” 1 William Blackstone, Commentaries on the Laws of England 121 n.64 (Herbert Broom & Edward A. Had-ley eds., 1875). William Draper Lewis, a later editor, wrote ”[t]hat the right of carrying arms as secured by the U.S. Constitution, and generally by State constitutions, does not include the habitual carrying of concealed deadly weapons by private individuals.” 1 William Blackstone, Commentaries on the Laws of England 144 n.91 (William Draper Lewis ed., 1897). Both these readings, like Cooley's, presume that some arms bearing for self-defense outside the home is encompassed in the right.

. In Cooley’s other treatise, he often described the right to bear arms as oriented toward the goal of citizenry-wide military readiness. To this end, "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order.” Thomas M. Cooley, The General Principles of Constitutional Law in the United States of America 271 (1880), cited in Heller, 554 U.S. at 617-18, 128 S.Ct. 2783.
Although one might be tempted to read this passage, and the section in which it appears, as suggesting that Cooley believed the right to be devoted solely to the defense of the community, two of his later comments suggest otherwise. First, a later line in the same treatise clarifies: "[T]he secret carrying of those [arms] suited merely to deadly individual encounters may be prohibited.” Id. at 272. If Cooley understood the right to allow weapons bearing only for training in "discipline in arms” and the like, this later clarification would not have been necessary: of course the Amendment would not foreclose restrictions on concealed carrying, just as it would not foreclose restrictions on open carrying — or carrying altogether. And second, as previously noted, Cooley’s more popular treatise referenced and contemplated a self-defense component to the right. Cooley, A Treatise on the Constitutional Limitations, supra, at 350 & n. 1.

. Some of these authorities took their cues from the Supreme Court’s decision in Presser v. Illinois, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), which they understood as tying the right exclusively to militia service. See, e.g., Davis, supra, at 645. Justice Stevens, dissenting in Heller, read it similarly. Heller, 554 U.S. at 673, 128 S.Ct. 2783 (Stevens, J„ dissenting). The majority called that view "simply wrong,” concluding that "Presser said nothing about the Second Amendment's meaning or scope, beyond the fact that it does not prevent the prohibition of private paramilitary organizations.” Id. at 621, 128 S.Ct. 2783 (majority opinion).
One other nineteenth-century author cited in Heller registers disapproval of public arms bearing but offers no legal assessment of whether such bearing is within the scope of the right. See Benjamin Vaughan Abbott, Judge and Jury: A Popular Explanation of Leading Topics in the Law of the Land 333-34 (1880) ("Carrying them for defence, in the more settled parts of the land, savors of cowardice rather than of prudence; a well-behaved man has less to fear from violence than from the blunders of himself and friends in managing the pistol he might carry as a protection.”), cited in Heller, 554 U.S. at 619, 128 S.Ct. 2783.

. Excluding, of course, rational basis review. See Heller, 554 U.S. at 628 n. 27, 128 S.Ct. 2783.

. In Chovan, we applied intermediate scrutiny to a Second Amendment claim that involved "a substantial burden on" a right outside the core of the Second Amendment. 735 F.3d at 1138. Intermediate scrutiny is not appropriate, however, for cases involving the destruction of a right at the core of the Second Amendment.

.San Diego, like most of the populous cities and counties in California, is incorporated. See California State Association of Counties, available at http://www.csac.counties.org/ cities-within-each-county (last visited Feb. 4, 2014).

. It is worth noting that California has one of the most restrictive gun regulatory regimes in the nation. Indeed, it is one of only eight states with a “may-issue” permitting regime, meaning that a general desire to carry in self-defense is not sufficient to justify obtaining a permit. See Drake, 724 F.3d at 442 (Hardi-man, J., dissenting).

. This is likely the result of a changing social convention in favor of concealed rather than open carry. See Volokh, Implementing the Right, supra, at 1521 ("In many places, carrying openly is likely to frighten many people, and to lead to social ostracism as well as confrontations with the police.”).

. The dissent curiously misinterprets our opinion as ruling on the constitutionality of California statutes. We decline to respond to its straw-man arguments.

. The Supreme Court of Illinois has also found Moore persuasive. See People v. Aguilar, 2013 IL 112116, 377 Ill.Dec. 405, 2 N.E.3d 321, 327 (2013) (ruling "that the second amendment protects the right to possess and use a firearm for self-defense outside the home”).

. Indeed, the Third Circuit went even further than that. It not only rejected history and tradition, but specifically relied on more recent mid-twentieth century developments to justify New Jersey's permitting scheme. See Drake, 724 F.3d at 432-34; see also id. at 447-52 (Hardiman, J., dissenting) (criticizing the majority’s reliance on mid-twentieth-century New Jersey law to justify narrowing the scope of t[ie Second Amendment right). The Third Circuit majority concluded that even if the Second Amendment right extended outside the home, permitting restrictions that required individuals to show a "justifiable need to carry a handgun” in the form of "specific threats or previous attacks which demonstrate a special danger to the applicant’s life” were analogous to the type of "longstanding” regulations that the Supreme Court had identified as "presumptively lawful” in Heller. Id. at 428-29 (majority opinion). To reach this conclusion, the Third Circuit relied upon New Jersey law, which had incorporated some version of the "justifiable need” requirement into its permitting scheme since 1924. Id. at 432. We reject this analysis because it goes against the analysis of the Second Amendment’s scope employed in Heller and McDonald: those cases made clear that the scope of the Second Amendment right depends not on post-twentieth century developments, but instead on the understanding of the right that predominated from the time of ratification through the nineteenth century. See, e.g., Heller, 554 U.S. at 605, 128 S.Ct. 2783; see also Drake, 724 F.3d at 452 (Hardiman, J., dissenting) (”[R]egardless of whether New Jersey’s justifiable need requirement dates to 1924 or 1966 for purposes of the inquiry, there is not a sufficiently longstanding tradition of regulations that condition the issuance of permits on a showing of special need for self-defense to uphold New Jersey’s law on that basis.”).

. Because we reverse on the basis of the Second Amendment issue, we do not reach any of Peruta’s other claims.